UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-20654-Civ-COOKE/TORRES

FRANK LOPEZ, as personal
representative of the Estate of
Giraldo Lopez, and MAGALY
NUNEZ-DELGADO, individually
and as assignee of Michelle Soto,

    Plaintiffs,

v.

ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY,

    Defendant.
_____/

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

    Plaintiffs bring this third-party insurance bad faith action against Defendant Allstate Fire and Casualty Insurance Company ("Allstate") for its allegedly unreasonable failure to settle claims made against Allstate's insured, Michelle Soto, resulting in an excess judgment against its insured. Before me now is Allstate's Motion for Summary Judgment (the "Motion") (ECF No. 57) and Statement of Material Facts in Support thereof ("Statement of Facts" or "SOF") (ECF No. 58), Plaintiffs' Response in opposition to Defendant's Motion for Summary Judgment (ECF No. 61), Plaintiff's Response in Opposition to Defendant's Statement of Material Facts (ECF No. 62), and Defendant's Reply to Plaintiff's Response to Allstate's Motion for Summary Judgment (ECF No. 67). I have reviewed the Motion, response, reply, the record, and the relevant legal authorities. For the reasons that follow, Defendant's Motion is denied.

                      **I.**        **UNDISPUTED MATERIAL FACTS**

    Unless otherwise noted, there are no genuine disputes as to the following material facts. Allstate issued automobile policy number 9 71 397052 07/28 to Michelle Soto ("Ms. Soto") for the policy period July 28, 2011 to January 28, 2012

1

(the "Policy"). The Policy provides bodily injury ("BI") liability coverage in the amount of $25,000 per person and $50,000 per accident. The Policy also provides personal injury protection ("PIP") coverage in the amount of $10,000 per person, with an additional death benefit of $5,000.

On September 6, 2011, Ms. Soto lost control of her vehicle and crashed into a bus stop bench where Giraldo Lopez ("Mr. Lopez") and his wife, Magaly Nunez Delgado ("Mrs. Nunez Delgado") were waiting. Ms. Soto's vehicle hit Giraldo Lopez, killing him at the scene. Mrs. Nunez Delgado witnessed the accident from only a few feet away. Ms. Soto reported the accident to Allstate on September 7, 2011. As of that afternoon, Allstate had concluded that Ms. Soto was liable for the accident and that the value of the liability claim for the fatality of Mr. Lopez likely exceeded the $25,000 per person BI liability limits. Frank Lopez, Mr. Lopez's son, retained Joe Kalbac, Esq. on or about September 7, 2011 to assist the family with the matter.

On September 8, 2011, Allstate sent a letter to Ms. Soto in reference to the accident. It stated, "The bodily injury liability limits section of your policy...provides coverage up to $25,000 per person and $50,000 per accident. The value of the bodily injury claim(s) of Geraldo [sic] Lopez appears to exceed the limits under your policy." (ECF No. 58-6). It further stated that "the damages appear to exceed your policy limits and you face personal exposure for liability for any damages above your insurance protection," and that, "A jury could determine that you are liable for all or a part of medical bills and funeral costs to date, certain damages to the Estate of the decedent and any pain and suffering or lost support for qualified survivors." (*Id.*). Finally, the letter read, "We will make every effort to settle this case within your insurance coverage in exchange for a full and final release of all claims. However, if the case cannot be resolved within your policy limits, you may consider contribution of your own funds to resolve the matter and avoid an excess judgment." (*Id.*). The letter made no specific mention of PIP benefits available under the Policy. (*Id.*).

On September 9, 2011, Mr. Kalbac spoke to certain Allstate adjusters and advised that he represented the Estate. There is a dispute as to whether an Allstate adjuster told Mr. Kalbac that the full $65,000 of available benefits under the Policy

would be tendered. (ECF No. 58, ¶ 7; ECF No. 62, ¶ 7). At some point, the file was transferred to adjuster Genevieve Bernet. On September 9, 2011, Allstate tendered the $5,000 death benefit to the Estate. Mr. Kalbac received the $5,000 check on September 12, 2011, and those funds were thereafter used towards Mr. Lopez's funeral expenses.

On September 10, 2011, Ms. Bernet sent a form letter to the Colson Hicks Eidson Trust Account[1]. The letter stated, "We received notice that you are representing [BLANK]." (ECF No. 58-7). It requested information about the client, including "their complete name, address, marital status, date of birth, social security number and a description of the injury alleged from the accident," as well as, "[t]he name, address and phone number of all physicians and medical care facilities that have relevant information about your client(s)." (*Id.*). Another identical letter was sent on September 11, 2011. Based on their dates, the letters appeared to be related to Mr. Lopez's claim, and not to any claim of Mrs. Nunez Delgado. (ECF No. 62, ¶ 10).

On September 12, 2011, Allstate tendered the $25,000 BI liability policy limits to resolve the liability claims of the Estate. The $25,000 check was conditioned on the execution of a general release. Allstate's proposed general release stated that the personal representative of the Estate would "release and forever discharge Michelle Soto from any and all claims, demands, damages, including any and all unknown and unanticipated damages sustained directly or indirectly by the Estate of Geraldo Lopez and his or her survivors if applicable, …including any actions and causes of action whether arising at law or in equity which the Estate and the decedent's survivors may have had, may now have, or may hereafter have…." (ECF No. 58-11). In a letter accompanying the $25,000 check and proposed general release, Ms. Bernet advised Mr. Kalbac that he could send her any "suggested changes, additions or deletions with a short explanation," or "a release form that you prefer to use…." (*Id.*). A copy of the letter and proposed general release was sent to Ms. Soto.

On September 12, 2011, Ms. Bernet and Mr. Kalbac spoke, and Ms. Bernet confirmed that the BI liability policy limits and the PIP limits for Mrs. Nunez

---

[1] Mr. Kalbac was an attorney with the Colson Hicks Eidson firm.

Delgado's claim would not be tendered at that time. During either this conversation, or the initial conversation on September 9, 2011, Mr. Kalbac disclosed to Allstate that Mrs. Nunez Delgado was suffering physically and psychologically as a result of witnessing her husband's death. Ms. Bernet advised Mr. Kalbac that Allstate needed the marriage certificate of Mr. Lopez and Mrs. Nunez Delgado. During the September 12th conversation, Mr. Kalbac advised Ms. Bernet that Mrs. Nunez Delgado would be seeing a doctor. There is a dispute as to whether, at that time, Ms. Bernet requested medical records from Mr. Kalbac. (ECF No. 58, ¶ 12; ECF No. 62, ¶ 12). In a letter confirming the conversation, Ms. Bernet stated: "Please provide me with a copy of the marriage certificate of Ms. Nunez to Mr. Lopez as well as all medical records pertaining to treatment she may be receiving that is as a result of this accident." (ECF No. 58-9). A copy of this letter was sent to Ms. Soto. On September 13, 2011, Mr. Kalbac sent a letter to Ms. Bernet, wherein he stated that, as a result of the accident, Mrs. Nunez Delgado was suffering from "insomnia, headaches, high blood pressure, neck pains, depression and other emotional physical consequences." (ECF No. 58-13).

Allstate hired an investigator to, among other things, research the marriage between Mrs. Nunez Delgado and Mr. Lopez. As of September 13, 2011, the investigator had concluded that Mrs. Nunez Delgado and Mr. Lopez were probably married in another country.

On September 13, 2011, Mr. Kalbac informed Ms. Bernet that he wished to take Ms. Soto's "sworn testimony as to how and why this tragic crash occurred." (ECF No. 58-13). Mr. Kalbac never specifically requested a financial affidavit of Ms. Soto before filing the lawsuit against her. Ms. Bernet advised Ms. Soto of Mr. Kalbac's request, and told Ms. Soto that Allstate could retain legal counsel to assist her. In a letter dated September 19, 2011, Ms. Bernet advised Ms. Soto that, "The value of the bodily injury claim(s) of Geraldo Lopez appears to exceed the limits under your policy and the claim that is being presented for Magaly Nunez Delgado as spouse of Mr. Lopez may also exceed the limits." (ECF No. 58-14). Allstate retained Ninowtzka Mier, Esq. to represent Ms. Soto in the "handling of the claimant's attorney request for a sworn statement through resolution of the claim."

4

(ECF No. 58-15). Ms. Mier advised Ms. Soto that, while she was not legally required to appear for the sworn statement, doing so may encourage settlement. (ECF No. 58-16).

Ms. Mier asked Mr. Kalbac to advise as to the scope of the questions he intended to ask Ms. Soto in the sworn statement. Mr. Kalbac declined to provide the requested information and rejected Allstate's tender of $25,000. On September 23, 2011, Mr. Kalbac filed a lawsuit against Ms. Soto for the wrongful death of Mr. Lopez and for the negligent infliction of emotional distress as to Mrs. Nunez-Delgado. There is a dispute as to whether, on or about September 23, 2011, Mr. Frank Lopez provided a copy of his parents' marriage certificate to Mr. Kalbac. (ECF No. 58, ¶ 24; ECF No. 62, ¶ 24). Mr. Kalbac provided the marriage certificate to Ms. Soto's defense counsel on October 3, 2011. No medical bills were provided to Allstate prior to the commencement of the lawsuit. (ECF No. 62, ¶¶ 39, 40).

On September 26, 2011, Allstate again advised Ms. Soto that the claims of the Estate and Mrs. Nunez Delgado appeared to exceed the available bodily injury liability limits. On September 30, 2011 Allstate offered $50,000 to settle the Lopez family's claims against Ms. Soto ($25,000 for the Estate and $25,000 for Mrs. Nunez Delgado).

On September 29, 2011, Ms. Bernet alerted a PIP adjustor about Mrs. Nunez Delgado's claim for emotional distress, and that Mrs. Nunez Delgado would be going to the doctor, but that Allstate did not have any medical bills yet. The PIP department opened a PIP claim for Ms. Nunez Delgado. On September 30, 2011, a PIP adjuster sent an application to Mrs. Nunez Delgado for no-fault PIP benefits, although Allstate's policy was to send such applications to the claimant's counsel, but there is a dispute as to whether that application was sent to Mrs. Nunez Delgado's correct address.

On October 18, 2011, Plaintiffs deposed Ms. Soto and she answered questions regarding her assets. By October 24, 2011, after having been told that any further absences from work to care for his mother would result in job termination, Frank Lopez decided to call off attempts to settle with Allstate for Ms. Soto's $65,000 policy limits.

5

After suit was filed, Plaintiffs' liability claims against Ms. Soto were transferred to Allstate adjuster Lori Hammer. On November 4, 2011, Ms. Hammer advised Ms. Soto of her bodily injury liability limits, that the amount of damages may exceed her policy limits, and that she will be liable for any excess judgment. On November 29, 2011, Mr. Kalbac rejected Allstate's $50,000 offer, which had been tendered on September 30, 2011. The Lopez family's offer was rescinded on October 24, 2011. As a condition of settling for this amount, the Lopez family had sought proof of Ms. Soto's assets.

On January 27, 2012, Allstate closed its PIP investigation, noting that it would be reopened if medical bills or the treatment status for Ms. Nunez-Delgado became available. There is a dispute as to whether and when Mr. Kalbac provided Allstate with medical bills. (ECF No. 58, ¶ 39; ECF No. 62, ¶ 39).

Allstate propounded proposals for settlement on July 19, 2012, which totaled $50,000, and again offered $50,000 to the Lopez family on or about October 9, 2012. These offers did not include the $10,000 of PIP benefits for Mrs. Nunez Delgado. The Lopez family authorized Mr. Kalbac to settle their claims against Ms. Soto for $65,000, but never authorized acceptance of just the $25,000 per person bodily injury liability policy limits.

Plaintiffs and Ms. Soto eventually agreed to enter into a consent judgment with regards to the liability claims. An Amended Consent Final Judgment was entered in favor of Frank Lopez, as Personal Representative of the Estate and against Ms. Soto in the amount of $1,150,000, and in favor of Mrs. Nunez Delgado and against Ms. Soto for $350,000.

Plaintiffs never filed a Civil Remedy Notice concerning Mrs. Nunez Delgado's claim for PIP benefits. Following the entry of the consent judgment, Allstate tendered the $10,000 in PIP benefits to Mrs. Nunez Delgado, along with the $25,000 per person bodily injury liability policy limits. Allstate maintains that its PIP department never received any medical bills for Mrs. Nunez Delgado's treatment, though Plaintiffs maintain that bills were provided to Allstate after the lawsuit was filed. (ECF No. 58, ¶ 50; ECF No. 62, ¶ 50).

## II.   LEGAL STANDARDS

Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant has the burden of demonstrating through depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials, the absence of any genuine material, factual dispute. *Id.*

An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). An issue is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.*

In order for a movant to be entitled to summary judgment, he bears the initial burden of establishing the nonexistence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). On summary judgment, it is not the function of the Court to resolve conflicting views of the evidence. When viewing the evidence on a motion for summary judgment, the Court is required to draw all reasonable inferences in favor of the non-moving party. *Id.*

## III.   DISCUSSION[2]

### A.   Florida Bad Faith Law

When an insurer undertakes to defend an insured against the claims of a third party, control of settlement of those claims is ceded to the insurer. *See Doe on Behalf of Doe v. Allstate Ins. Co.*, 653 So. 2d 371, 373-74 (Fla. 1995). By virtue of this control, the insurer "assumes the duty of negotiating to settle in good faith." *Kivi v. Nationwide Mut. Ins. Co.*, 695 F.2d 1285, 1287 (11th Cir. 1983). "[A]n insurer's good faith duty obligates it to: 1) investigate the facts of the claim, 2) give fair consideration to a settlement offer that was not unreasonable under the facts, 3) advise its insured of settlement opportunities, 4) settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so, 5) advise its insured of the probable outcome of litigation, 6) warn its

---

[2] Because this is a diversity action arising out of an incident occurring in Florida, Florida substantive law applies. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

insured of the possibility of an excess judgment, and 7) advise its insured of any steps he might take to avoid an excess judgment." *Diperna v. GEICO General Ins. Co.*, No. 6:12-cv-687-Orl-36KRS, 2013 WL 6050759, at *6 (M.D. Fla. Nov. 15, 2013) (citing *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). "[I]n handling the defense of a claim against its insured, [an insurer] has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony*, 386 So. 2d at 785.

"[T]he question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the totality of the circumstances standard." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). Ordinarily, "the question of failure to act in good faith with due regard for the interests of the insured is for the jury." *Id.* The "focus in a bad faith case is not on the actions of the claimant but…on those of the insurer in fulfilling its obligations to the insured." *Berges*, 896 So. 2d at 677. Negligence is a factor to be considered under the totality of the circumstances, but bad faith is more than mere negligence. *Losat v. Geico Cas. Co.*, No. 8:10-cv-1564-T-17TGW, 2011 WL 5834689, at *9 (M.D. Fla. Nov. 21, 2011). An insurer found to have acted in bad faith, "has to pay the entire judgment entered against the insured in favor of the injured third party, including any amount in excess of the insured's policy limits." *Diperna*, 2013 WL 6050759, at *6.

### B. Analysis

Defendant contends it is entitled to summary judgment on numerous grounds. I will address each of Defendant's arguments in turn.

#### 1. Allstate's Failure to Tender PIP Benefits to Mrs. Nunez Delgado

Allstate argues that its failure to tender the $10,000 in PIP benefits to Mrs. Nunez Delgado on or before October 24, 2011 cannot be a basis for a finding of bad faith on its part because it had no legal obligation to pay PIP benefits to Mrs. Nunez Delgado prior to October 24, 2011, and because PIP is a first-party coverage that could not be used to resolve Plaintiffs' liability claims against Ms. Soto.

Section 627.736 (2011), Florida Statutes, Florida's PIP Statute, requires automobile insurance policies to provide PIP coverage to, *inter alia*, pedestrians

struck by the insured motor vehicle. Fla. Stat. § 627.736(1) (2011). The PIP Statute provides "for medical, surgical, funeral and disability insurance benefits without regard to fault." *Fla. Med. & Injury Ctr., Inc. v. Progressive Exp. Ins. Co.*, 29 So. 3d 329, 341 (Fla. 5th DCA 2010).

Paragraphs (4) and (5) of the PIP Statute "set forth strict guidelines…including how and when charges must be submitted and benefits paid." *Allstate Ins. Co. v. Holy Cross Hosp., Inc.*, 961 So. 2d 328, 332 (Fla. 2007). "PIP benefits shall be due and payable as loss accrues, upon receipt of reasonable proof of such loss and the amount of expenses and loss incurred which are covered by the policy." *Allstate Ins. v. Kaklamanos*, 843 So. 2d 885, 891 (Fla. 2003); *see also* Fla. Stat. § 627.736(4) (2011).

Allstate contends that no reasonable jury could find that it acted in bad faith when it failed to tender the $10,000 PIP benefits to Mrs. Nunez Delgado (along with the other $55,000 of benefits available under the Policy, which Allstate did tender) on or before October 24, 2011, because its obligation to pay those PIP benefits was never triggered, as Allstate had not received proof of Mrs. Nunez Delgado's loss and the amount of that loss before October 24, 2011. I disagree. In order for Plaintiffs to prevail, they need only prove that, under the totality of the circumstances, Allstate failed to settle, "where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Boston Old Colony*, 386 So. 2d at 785. I find that, even if Allstate was not yet obligated pursuant to the Florida PIP Statute to make the $10,000 PIP payment to Mrs. Nunez Delgado as of October 24, 2011, a reasonable jury could find that, under the totality of the circumstances, Allstate should have settled for $65,000, inclusive of those PIP benefits, in order to protect its insured from the potential of an excess judgment. *See Geico Cas. Co. v. Beauford*, No. 8:05-cv-697-T-24EAJ, 2007 WL 2412974, at *2 (M.D. Fla. Aug. 21, 2007) ("Florida case law states that an insurer has the discretion to reasonably determine how to best limit the insured's liability, and that whether the insurer could have minimized the insured's exposure to excess judgment through wiser settlement practices (such as a global settlement conference) is a question for the jury."); *Perrien v. Nationwide Mut. Fire Ins. Co.*, No. 8:08-cv-2586-T-30TGW, 2010 WL 2921621, at *3 (M.D. Fla. July

23, 2010) (noting that no Florida authority prohibits a claimant from offering to settle all claims and damages arising out of an accident, even where the types of coverages involved were distinct and separate).

Allstate also contends that as a matter of law it cannot be found to have acted in bad faith for failing to tender the $10,000 PIP benefits to Mrs. Nunez Delgado because it was required to "reserve $5,000 of personal injury protection benefits for payment to physicians…or dentists…who provide emergency services and care" and this amount "may be used only to pay claims from such physicians or dentists until 30 days after the date the insurer receives notice of the accident." Fla. Stat. § 627.736(4)(c) (2011). I disagree. Allstate first learned of the accident on September 7, 2011. Therefore, as of October 7, 2011, the thirty-day time period had expired. Plaintiffs did not withdraw their settlement offer until October 24, 2011. Therefore, I cannot find that, as a matter of law, Allstate acted reasonably in failing to tender the $10,000 PIP benefits to Mrs. Nunez Delgado on or before October 24, 2011. Moreover, there is no record evidence that Allstate attempted to raise this issue with Plaintiffs during the time period in which it had the opportunity to settle. A jury is entitled to take that omission into account in determining whether Allstate acted in bad faith. *See Kivi v. Nationwide Mut. Ins. Co.*, 695 F.2d 1285, 1288 (11th Cir. 1983) (rejecting insurer's argument that settlement offer was deficient because it failed to provide for disposition of omnibus insured's claim, or for the release of subrogation rights and hospital lien, where insurer never mentioned those issues as impediment to settlement); *Berges*, 896 So. 2d at 672 ("The question of bad faith in this case extends to Infinity's entire conduct in the handling of the claim, including the acts or omissions of Infinity in failing to ensure payment of the policy limits within the time demands.").

Allstate further contends that no reasonable jury could find that Allstate should have paid the $10,000 in PIP benefits to Mrs. Nunez Delgado to resolve Plaintiffs' liability claims against Ms. Soto because Mrs. Nunez Delgado qualified as an omnibus insured under the Policy, making her claim a first-party claim against Allstate without any regard for the fault of Ms. Soto. I find this argument unavailing. Whether the policy benefits would ultimately have been owed as a result of Ms.

10

Soto's fault, or as a result of the contractually available PIP benefits, Plaintiffs claim they would have settled their claims arising from the accident for the $65,000 available under the Policy. Taking the evidence in the light most favorable to Plaintiffs, had Allstate settled those claims for that amount, Ms. Soto would not have been exposed to the excess judgment. A reasonable jury may find that Allstate acted in bad faith in failing to settle.

Finally, Allstate contends that Plaintiffs' claim fails because Mrs. Nunez Delgado never complied with all conditions precedent for filing a first-party bad-faith claim based on Allstate's handling of her claim for personal injury protection benefits. I disagree. Plaintiffs' claim is not a claim for payment of PIP coverage limits. Plaintiffs' claim is based on Allstate's alleged bad faith failure to settle Plaintiffs' claims in order to protect its insured from an excess judgment. The fact that part of the settlement proceeds would have come from PIP benefits under the policy does not render this a first-party bad-faith claim.

### 2. Whether Allstate Otherwise Has Demonstrated Entitled to Summary Judgment

Allstate argues that it is entitled to summary judgment because the undisputed facts demonstrate that no reasonable jury could find that it acted in bad faith. I disagree.

Allstate's first argument is that it diligently tendered the $25,000 per person BI liability policy limits to the Estate on September 12, 2011 and September 30, 2011, and to Mrs. Nunez Delgado on September 30, 2011. Allstate's argument, however, is based on the premise that it was not reasonable for Plaintiffs' settlement offer to include the sums available under the Policy for PIP benefits. Defendant has not cited any cases that stand for the proposition that, as a matter of law, an insurer cannot be found to have acted in bad faith where it timely tenders BI liability policy limits, but holds back PIP benefits because it has not yet received sufficient documentation to entitle the claimant to PIP benefits. *But see Perrien*, 2010 WL 2921621, at *3 (rejecting insurer's argument that it "cannot be held liable for bad faith when it timely tendered its bodily injury limits and the claimant chose to deny the tender and demand a settlement that included a property damage claim that

11

posed no realistic exposure to the insured"). Accordingly, I cannot find that, as a matter of law, no reasonable jury could find Allstate to have acted in bad faith under these circumstances.

Allstate's second argument is that it is entitled to summary judgment because it never had a realistic opportunity to settle Plaintiffs' claims within Policy limits. Allstate claims that it tendered the "policy limits" when it tendered the $25,000 BI liability limits to the Estate and Mrs. Nunez Delgado each. However, Allstate's argument continues to insist that it was not required to consider the portion of the settlement offer that corresponded with the $10,000 PIP benefits available under the Policy. Allstate, however, has failed to cite any cases that stand for this proposition, and this Court has found none. Alternatively, Allstate argues that there is no evidence, other than the "self-serving" testimony of Frank Lopez and Mr. Kalbac, demonstrating that Plaintiffs would have settled their claims against Ms. Soto had Allstate added the $10,000 PIP benefits to their tender. Allstate's contention, however, highlights the issue of fact that exists with respect to whether or not Plaintiffs were actually willing to settle their claims. This issue of fact precludes summary judgment.

Allstate's third argument is that it is entitled to summary judgment because the undisputed facts demonstrate that it complied with its duties of good faith to its insured. An insurer's duty of good faith obligates it to "advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Boston Old Colony*, 386 So. 2d at 785. Allstate argues that there is no factual dispute that it advised Ms. Soto on numerous occasions that the claims against her likely exceeded the $50,000 bodily injury liability policy limits and that she could attempt to avoid an excess judgment by contributing towards a settlement in excess of those policy limits. However, there is a factual dispute, *inter alia*, as to whether Allstate ever informed Ms. Soto of the availability of $10,000 in PIP benefits. (ECF No. 62, ¶ 61). This is a material fact that the jury must resolve and weigh in the totality of the circumstances. Accordingly, summary judgment is unavailable.

### 3. Whether Allstate is Entitled to Summary Judgment Because No Reasonable Jury Could Conclude that Its Conduct Caused the Excess Judgment

Allstate's final grounds for moving for summary judgment is that no reasonable jury could find that it caused its insured to be liable for the excess judgment. Allstate's argument is again based on the contention that no reasonable jury could find that Plaintiffs were willing to settle their claims against Ms. Soto for the applicable liability policy limits. Allstate's argument fails for two reasons. First, Plaintiffs do not claim to have been willing to settle their claims for "the applicable liability policy limits." Rather, Plaintiffs contend that they would have settled their claims against Ms. Soto for $65,000 and a sworn statement from Ms. Soto demonstrating that she lacked assets from which to collect an excess judgment. With respect to the $65,000 monetary portion of the settlement offer, Plaintiffs were never concerned with specifically requiring Allstate to tender policy limits for any particular type of coverage available under the Policy. Simply stated, Plaintiffs wanted it all, from whatever source. Second, whether or not Plaintiffs were actually willing to settle is a question of fact for the jury.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 57) is **DENIED**.

**DONE and ORDERED** in chambers, at Miami, Florida, this 10th day of September 2015.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*